# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 2 C 6332 | **DATE** | 11/14/2003 |
| **CASE TITLE** | Lynne A. Sienkiewicz vs. Jo Anne B. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   **Enter MEMORANDUM, OPINION AND ORDER: For the foregoing reasons, plaintiff Sienkiewicz's motion for summary judgment [9-1] is denied, and defendant Commissioner Barnhart's motion for summary judgment [12-1] is granted. This is a final and appealable order, terminating the case.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | | NOV 1 9 2003 | |
| | Notified counsel by telephone. | | | date docketed | |
| ✓ | Docketing to mail notices. | | | docketing deputy initials | 15 |
| ✓ | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | | | |
| TSA | courtroom deputy's initials | | | date mailed notice | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LYNNE A. SIENKIEWICZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) No. 02 C 6332 | |
| | ) | |
| JO ANNE B. BARNHART, Commissioner | ) Wayne R. Andersen | |
| of Social Security, | ) District Judge | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM, OPINION AND ORDER

This case is before the Court on the parties' cross-motions for summary judgment. For

the reasons stated below, the motion of plaintiff Lynne Sienkiewicz is denied, and the motion of

Jo Anne Barnhart, Commissioner of Social Security, is granted.

NOV 1 9 2003

## BACKGROUND

Plaintiff Lynne Sienkiewicz is 38 years old. She has a high school education, and from

1983 through 1993, she was employed as a child care provider and as an egg inspector. Plaintiff

applied for disability insurance and supplemental security income on January 29, 1999. In her

application for disability benefits, Plaintiff claimed a disability since January 31, 1990. However,

the record reflects that Plaintiff was employed through April 20, 1993. Thus, Plaintiff submitted

an amended application for disability which alleged a disability date of April 20, 1993. Plaintiff's

application for disability benefits and supplemental security income was denied, and she

requested a hearing.

15

I.     Medical History

Although Plaintiff alleges a disability as of April 1993, the earliest medical evidence in the record is dated December 1998 and consists solely of a report of a pelvic ultrasound, which revealed a cyst in the right ovary. The remaining records are dated after Plaintiff had submitted her application for disability benefits.

On June 7, 1999, Plaintiff attended a consultative internal medicine examination performed by Scott Kale M.D. and a psychiatric examination conducted by Allen Nelson M.D., which were requested by the state disability determination agency. In the internal medicine consultative exam with Dr. Kale, Plaintiff reported that she suffered from frequent migraine headaches and that she had a history of asthma. Plaintiff also reported pain in her right knee. Dr. Kale diagnosed obesity, a history of asthma with no present evidence, and a history of pain in the lower right extremity with no abnormalities identified.

In the psychiatric consultative exam with Dr. Nelson, Plaintiff reported that she had been depressed for eighteen months and that she had crying spells, insomnia and a tendency to overeat. She reported taking two medications, Lorazapam and Zoloft, for anxiety, panic attacks and depression, but she did not report any current psychiatric treatment or any prior psychiatric hospitalizations. Plaintiff's daily activities included performing light household chores when possible, interacting with her daughter, watching television, listening to the radio and maintaining contact with her sister and father. Dr. Nelson diagnosed moderate dysthymia disorder, which is depressive disturbance characterized by sadness, loss of interest and withdrawal. He concluded that for the past eighteen months, Plaintiff had become increasingly chronically depressed and anxious and had undergone a marked social withdrawal.

On July 9, 1999, Carl Hermsmeyer Ph.D. reviewed Plaintiff's records and offered an opinion on her mental impairments. Dr. Hermsmeyer found that Plaintiff had an affective disorder that caused slight restriction of daily activities, slight difficulties in maintaining social functioning, and seldom caused deficiencies in concentration, persistence, or pace. He opined that Plaintiff would have moderate limitations relating to detailed instructions, but no other significant mental limitations. Dr. Hermsmeyer also concluded that Plaintiff's mental status exam and her daily activities indicated that she had the capacity to perform simple tasks.

On August 2, 1999, Mohammad Irahad M.D. reviewed Plaintiff's records and offered an opinion on her physical impairments. He opined: (1) Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; (2) she could stand and/or walk for six hours in an eight-hour day; and (3) she could sit six hours in an eight-hour day. He concluded that Plaintiff should avoid a concentrated exposure to respiratory irritants and extremes of temperature, but that moderate exposure could be tolerated.

The earliest treatment note in the record is dated July 19, 1999. On that date, Plaintiff consulted with Dr. Lim, an orthopedist, and complained of pain and numbness in her right leg and foot. Dr. Lim recommended heat, massage and rest for a few weeks and prescribed Naprosyn. Three months later, on October 27, 1999, Plaintiff returned to Dr. Lim and reported additional problems with her right leg, including numbness, tingling and pain down the right peroneal nerve. Dr. Lim took an x-ray of Plaintiff's lumbosacral spine, which looked normal, and prescribed Celebrex, which is an anti-inflammatory used to relive arthritis and to manage acute pain.

On January 12, 2000, Plaintiff sought treatment from an urgent care family practice for chest pain, shortness of breath, weakness for one week, and pain in her back and left arm. On examination, Plaintiff's lungs were clear, and her chest and back were tender. She was prescribed Celebrex again and denied other medications.

On January 17, 2000, Plaintiff attended a second consultative exam, which was scheduled by the state disability determination agency, with Stephen Epner M.D. Plaintiff again reported a history of asthma with two hospitalizations in the last six years. She stated that her asthma worsened in hot or humid weather and with activity and that she experienced shortness of breath after walking 100 feet or climbing six stairs. Plaintiff admitted that she had smoked a pack of cigarettes per day until she had quit two months earlier. Plaintiff also reported pain in her lower back and right knee and that the pain was exacerbated by walking, sitting, standing, bending, and lifting. Plaintiff reported that she had undergone an MRI, but that no herniated disc was diagnosed. She complained of daily migraine headaches for two years and abdominal pain. Plaintiff also reported an anxiety disorder, for which she took Zoloft, and a history of depression. She reported that she often avoided leaving her house, that she felt panicked when in crowds, and that she felt social isolation. She reported taking Lorazapam, Trazodone, Zoloft, Celebrex and Incodin in addition to asthma medications and Pepcid.

On exam, Dr. Epner found that Plaintiff was obese and had a slight limp and lumbering gait. She was slow to arise from a chair and reported that her knee pain made it difficult to get up. However, he observed that Plaintiff was able to get on and off the exam table without assistance. Her lungs were normal, but she had epigastric tenderness and tenderness of the lumbar vertebrae. Plaintiff also had pedal edema and some limitation of motion in her lumbar

spine. Plaintiff's knees had limited ranges of motion and swelling. Dr. Epner diagnosed asthma, low back pain, headaches, right knee pain, abdominal pain, and anxiety disorder. X-rays taken on this date revealed spasm of Plaintiff's lumbar spine, but no fracture or dislocation in her right knee.

Also on January 17, 2000, Plaintiff attended a second consultative psychiatric exam scheduled for her by the state disability determination agency, which was performed by John Conran M.D. Plaintiff reported that her daily activities included household tasks, picking her daughter up from school, and walking her home. Dr. Conran recognized that Plaintiff's mood was sad at times, however, concluded that her anxiety level and affect were appropriate to her current problems. Dr. Conran diagnosed moderate depression related to her physical problems and the pressures of raising a five-year old child.

On February 3, 2000, Young-Ja Kim M.D. reviewed Plaintiff's medical records and concluded that: (1) Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; (2) she could stand and/or walk for six hours in an eight-hour day; and (3) she could sit six hours in an eight-hour day. Dr. Kim opined that Plaintiff should only occasionally climb ramps and stairs, balance, stoop, kneel, crouch or crawl and that she never should climb ladders, ropes or scaffolds. He opined that Plaintiff did not have any environmental limitations.

On February 9, 2000, Man Mohan Singh M.D. reviewed Plaintiff's medical records and offered an opinion on her mental impairments. Dr. Singh concluded that Plaintiff's moderate situational depression caused slight restriction of activities of daily living, slight difficulties in maintaining social functioning, and seldom caused deficiencies in concentration, persistence, or pace.

On April 20, 2000, Plaintiff's record show that she underwent pulmonary function testing. The testing showed borderline to moderate obstruction, as well as low vital capacity.

On September 18, 2000, Plaintiff returned to Dr. Lim, eleven months after she last saw him. Dr. Lim noted that Plaintiff had developed some pain and cracking in her thigh and she also was treated for a calcaneus spur with plantar fascitis, which is an outgrowth on the heel of the foot associated with pain on the bottom of the foot. Dr. Lim recommended massage and exercises for the kneecap and supports for her shoes.

On November 8, 2000, Plaintiff returned to Dr. Lim, complaining that the pain in her heel was severe, and she wanted to try an injection for pain. Dr. Lim injected pain medication into the outgrowth on Plaintiff's heel, which provided complete relief of her pain. Dr. Lim suggested that Plaintiff perform stretching exercises and gave her a prescription for Lortab with no refill.

On November 14, 2000, Plaintiff was seen by Dr. Evelyn Figeroa, one of Plaintiff's own physicians. Dr. Figeroa diagnosed chest wall pain and prescribed Naprosyn. She diagnosed right lower quadrant pain, scheduled a pelvic ultrasound, and refilled Plaintiff's medications. Dr. Figeroa's notes from a telephone call in December 2000 indicate that the ultrasound revealed a 1.5 cm fibroid and that Plaintiff's follow-up appointment was cancelled.

On January 31, 2001, Plaintiff visited to Dr. Lim again and reported that the November 2000 injection provided great improvement in her heel for three months. Plaintiff complained that the pain had returned, and she wanted another injection. Dr. Lim gave her the injection.

II.     Hearing Testimony

On February 27, 2001, Administrative Law Judge Robert T. Karmgard ("ALJ") held a hearing at which Plaintiff was represented by counsel. At the hearing, Plaintiff and a vocational

expert testified. Plaintiff testified that she began experiencing panic disorder, anxiety, insomnia, stomach pain, and migraines in April 1993. She testified that she stopped working as a nanny because the pain in her legs made it hard to stand and that the pain started to really bother her around 1994. Plaintiff testified that she started having problems with her knee in 1998 or 1999 and with her heel in 2000.

Plaintiff also testified that, about five years earlier in approximately 1996, she started experiencing headaches so severe that she had to lie down and that they lasted between 15 minutes and one hour. She testified that the headaches occurred twice a week for the past year and that they occurred once a month for the previous four years. Plaintiff testified that, since around 1998, she experienced burning in her stomach about three times a week. She testified that, if she vacuumed, lifted too much or walked more than one block, she would have a hard time breathing. Plaintiff explained that, although she first started having problem with depression about five years ago, for the past six months she experienced symptoms such as crying, mood swings, and not wanting to leave the house. She testified to panic attacks twice a week for the past six months.

Plaintiff represented that she saw her two doctors at least every other week. Yet some of those medical records were not part of the record before the ALJ. Plaintiff also testified that the orthopedist who treated her foot and knee problems told her she had rheumatoid arthritis and recommended surgery on her knee. Plaintiff also submitted pharmacy print-outs, showing that she was prescribed antidepressants, asthma medications, and analgesics, among other medications, by several physicians. However, those records do not indicate the dates of the prescriptions, the number of doses filled, or whether refills were permitted.

7

Plaintiff testified that, since she stopped working, she spent her days trying to clean around the house, doing laundry and dishes, taking her daughter to school and helping her with homework. She testified that she did not vacuum or sweep. She visited her neighbor and her sister a couple of times a week. She socialized every couple of weeks with a friend from her neighborhood. Plaintiff testified that she could stand for 20 or 30 minutes, sit for 40 minutes, and walk for 20 minutes before she experienced symptoms. She testified that she could lift a maximum of 20 pounds.

The vocational expert testified that a person of Plaintiff's age and education could not perform Plaintiff's past relevant work. However, the vocational expert testified that an individual with Plaintiff's limitations could work if: (1) it was limited to sedentary work, with standing and walking no more than 15 minutes at a time; (2) with no climbing of ladders, ropes, or scaffolds; (3) with only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; (4) with no more than moderate exposure to pulmonary irritants and temperature extremes; (5) with only the capacity for simple tasks, and not complex or detailed tasks; and (6) with no more than incidental contact with the general public. The vocational expert testified that, with such limitations, a person could perform 2,000 hand packager jobs, 1,000 production inspector jobs and 4,500 assembler jobs in the Chicagoland area.

On June 29, 2001, the ALJ issued a decision denying Plaintiff's claim for disability benefits. Plaintiff sought review of the ALJ's decision, but her request for review was denied. Defendant Barnhart, Commissioner of Social Security, adopted the ALJ's decision as final, and Plaintiff has filed this appeal seeking judicial review of the Commissioner's denial of her claim for disability insurance and supplemental security income.

## DISCUSSION

### I. Standard of Review

We review an ALJ's decision to determine if it is "supported by substantial evidence." *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971); *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000). Substantial evidence, although more than a mere scintilla of proof, is "no more than such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995). Although we review "the entire record to determine if there is relevant evidence adequate to support the ALJ's conclusion, we do not decide the facts anew, reweigh evidence, or substitute our judgment for that of the ALJ." *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). A district court must affirm the ALJ's decision if it is reasonably drawn from the record and is supported by substantial evidence, even if some evidence may support the claimant's position. *Wolfe v. Shalala*, 997 F.2d 321, 326 (7th Cir. 1993).

### II. The Record Supports the ALJ's Finding that Plaintiff's Impairments Did Not Meet, Equal or Exceed Any Listed Impairment

To qualify for disability benefits under the Social Security Act, a claimant, who is the Plaintiff in this case, must be disabled within the meaning of the statute, and the statute provides that an individual is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C § 423(d)(1)(A). A claimant also must have a severe impairment that makes her unable to perform her "previous work or any other substantial gainful activity which

exists in the national economy." 20 C.F.R. § 404.1505. The fact finder must follow a five-step inquiry to determine whether a claimant is disabled: (1) is the claimant currently employed?; (2) is the claimant's impairment severe?; (3) does the impairment meet, equal or exceed a listed impairment enumerated in the regulations?; (4) is the claimant able to perform her past work?; and (5) is the claimant capable of performing any work in the national economy? *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

In this case, ALJ Karmgard found that Plaintiff had not engaged in substantial gainful employment since April 20, 1993, which is the date identified in her amended application for disability benefits. The ALJ also found that Plaintiff's asthma, low back pain, problems with her right knee, abdominal pain, chest pain, morbid obesity, migraine headaches, depression and anxiety significantly limited her ability to perform basic work activities. As a result, the ALJ concluded that Plaintiff had "severe" impairments. However, the ALJ determined that Plaintiff's impairments did not meet, equal or exceed the level of severity contemplated for any impairment listed in the regulations.

In order to establish that a claimant's condition medically equals a listed impairment, a claimant must present medical findings which are "at least equal in severity and duration" to the medical findings in a listing. 20 C.F.R. §§ 404.1526(a)-(b) (2003); *see also Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) ("The claimant bears the burden of proving his condition meets or equals a listed impairment."). Plaintiff now argues that the ALJ's decision does not contain adequate analysis of the question of whether the combination of her impairments equaled the level of severity contemplated in the listings. We disagree.

Principles of administrative law require the ALJ to rationally articulate the grounds for his decision, and our review the ALJ's determination is confined to the reasons provided by the ALJ, which are articulated in his decision. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). The Commissioner argues that the ALJ "adequately explained his conclusion in this case and the record amply supports his finding that Plaintiff did not equal any listed impairment."

In his decision, ALJ Karmgard concluded that Plaintiff's condition did not meet the requirements or equal the level of severity contemplated for any impairment listed in the regulations and incorporated his analysis of Plaintiff's residual functional capacity as support for those findings. Also, in connection with his evaluation of Plaintiff's condition, the ALJ found "that the claimant has a mild limitation in activities of daily living, moderate limitation in social functioning, moderate limitation in maintaining concentration, persistence or pace and no evidence of decompensation in a work or work-like setting."

An ALJ does not have to address every piece of evidence in his decision. *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002). Rather, the ALJ need only build "a bridge from the evidence to his conclusion." *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000). Although the ALJ combines his discussion of whether Plaintiff's impairments meet, equal or exceed a listed impairment with his consideration of Plaintiff's residual functional capacity, it is clear from this record that the ALJ considered all of the evidence presented to him, including whether the combination of Plaintiff's impairments equaled the level of severity contemplated in the listings, in reaching his decision.

Specifically, the ALJ sets forth an analysis of the medical evidence presented to him in conjunction with the testimony provided at the hearing. In reviewing the ALJ's analysis and

11

decision in its entirety, it is clear that the ALJ did, in fact, consider the combination of Plaintiff's impairments, including her claims of disabling symptoms and limitations, and what effect the totality of her symptoms and limitations had on her activities of daily living. The record also shows that Plaintiff's counsel in his submission to the ALJ for closing arguments concedes that Plaintiff's impairments may not, in fact, meet the level of severity of any listing enumerated in the regulations. In addition, the ALJ specifically considered an April 2000 pulmonary function study, which revealed some obstructive lung symptoms, but were "not of listing level severity."

Although Plaintiff now asserts that the ALJ did not consider whether the combination of her impairments equaled the level of severity contemplated in the listings, Plaintiff does not offer any specific listing that the ALJ should have considered. Thus, the record sufficiently supports the ALJ's finding that Plaintiff's impairments did not meet, equal or exceed any listed impairment contemplated the regulations.

### III. Substantial Evidence Supports the ALJ's Finding that Plaintiff Has Residual Functional Capacity

Since the ALJ concluded that Plaintiff's impairments did not meet, equal or exceed the level of severity contemplated in a listed impairment, the ALJ then had to determine Plaintiff's residual functional capacity or, in other words, what work-related activities Plaintiff could perform despite her impairments. Plaintiff argues that the ALJ's residual functional capacity finding is not supported by substantial evidence and that the ALJ did not properly assess the credibility of Plaintiff's testimony.

### A. The ALJ's Finding that Plaintiff Has Residual Functional Capacity Is Supported by the Record

In evaluating the evidence, an ALJ must consider the objective medical evidence in conjunction with subjective factors such as a claimant's daily activities, the nature of the symptoms, the type and effectiveness of medications taken to relieve symptoms, treatments other than medication and evidence relating to functional limitations. 20 C.F.R § 404.1545; *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995). An ALJ also considers whether the record contains any inconsistencies and whether the claimant's testimony conflicts with the rest of the evidence. 20 C.F.R. § 404.1529(c)(4) and 416.929(c)(4).

In his decision, ALJ Karmgard discussed the objective medical evidence presented at the hearing and concluded that, notwithstanding Plaintiff's impairments, she has a residual functional capacity. Plaintiff again argues here that the ALJ did not consider the disabling effect of all of her impairments and specifically argues that the ALJ failed to sufficiently consider the effect of Plaintiff's headaches and her exposure to moderate respiratory irritants. We disagree.

Clearly, the ALJ acknowledged that Plaintiff was limited by certain symptoms and concluded that Plaintiff, in fact, suffered severe impairments, including morbid obesity, asthma and migraine headaches, among others. As stated above, an ALJ does not need to address every piece of evidence in his decision. *Sims*, 309 F.3d at 429. Rather, he need only "build a bridge from the evidence to this conclusion." *Green*, 204 F.3d at 781.

In regard to Plaintiff's testimony about her headaches, the ALJ's stated in his discussion of the medical evidence that "the record in its entirety does not reflect any treatment history for on-going headache symptoms or any specific source of intervention. No specific limitations

13

were imposed regarding the headaches by any treating or evaluating source." The ALJ also noted that one of Plaintiff's doctors concluded that "the reported headaches (lasting ten minutes to an hour) are likely cluster headaches rather than migraines."

In regard to the respiratory irritants, the ALJ specifically considered a pulmonary function study, which was performed in April 2000, and concluded that although the study revealed some obstructive lung symptoms, those impairments did not satisfy any listing level of severity. Plaintiff argues that it was not reasonable for the ALJ to conclude that she could tolerate moderate exposure to pulmonary or respiratory irritants. However, the medical evidence shows that Plaintiff should avoid concentrated exposure to such irritants. Moreover, Plaintiff testified that she had difficulty breathing with physical exertion like vacuuming, lifting too much weight or walking too much. She also identified panic attacks, which clearly is not a respiratory irritant, as a trigger for her breathing problems. In light of this testimony, the ALJ limited Plaintiff's level of physical activity to accommodate her limitations and eliminated the possibility of exposure to concentrated levels of respiratory irritants to prevent any asthmatic exacerbations.

The ALJ has provided a sufficient bridge of evidence for the finding of Plaintiff's residual functional capacity. Specifically, ALJ Karmgard acknowledged that Plaintiff's impairments, including her headaches and asthma, were limiting and discussed the her impairments and the relevant medical records in conjunction with his assessment of her residual functional capacity. Moreover, none of the evidence that Plaintiff contends the ALJ ignored or misstated establishes that Plaintiff had any significant limitations which would effect her residual functional capacity. Thus, the ALJ's finding of residual functional capacity is supported by the evidence.

14

**B.    The Record Supports the ALJ's Assessment of Plaintiff's Testimony**

Plaintiff also argues that the ALJ did not properly assess the credibility of Plaintiff's testimony. Again, we disagree. As we have previously stated, "because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference. We will reverse an ALJ's credibility determination only if the claimant can show it was patently wrong." *Powers v. Apfel*, 207 F.3d 421, 435 (7th Cir. 2000).

ALJ Karmgard specifically concluded that Plaintiff's "allegations of disabling symptoms and limitations cannot be accepted and that the residual functional capacity finding in this case is justified." In reaching this conclusion, ALJ Karmgard offered the following analysis to support his assessment:

> The claimant has described daily activities which are not limited to the extent one
> would expect, given the complaints of disabling symptoms and limitation. The
> claimant is apparently able to care for young children at home, which can be quite
> demanding both physically and emotionally. When asked how she spends an
> average day, she said she does various household tasks. She picks up her daughter
> from school and walks her home. She looks after her own household tasks. It
> takes her a couple of hours to get to sleep, but she does sleep through much of the
> night when she does get to sleep. She has no close friends, but maintains regular
> contacts with her father and sister. Although she alleges an inability to
> concentrate, she drives, does errands visit[s] family, reads, watches television,
> fixes things and plays cards and games.

The ALJ also noted that Plaintiff has not received the type of medical care one would expect for a completely disabled person. Furthermore, the ALJ pointed out that the record does not contain "any opinions from treating or examining physicians indicating that [Plaintiff] is disabled or even has limitations greater than those determined in this decision."

Plaintiff also argues that the ALJ did not sufficiently consider "the type, dosage, effectiveness and side effects of [her] medications." The ALJ acknowledged that Plaintiff submitted an exhibit which identified various medications that were prescribed to Plaintiff. In addition, the medical evidence presented identifies some of the medications Plaintiff was prescribed. In his decision, the ALJ specifically discussed certain of those medications, including Zoloft and Naprosyn. However, in considering the appropriate weight to give this evidence, the ALJ states that "the exhibit also contains no evidence as to the actual symptomology observed regarding the claimant or as to the actual side effects reported by any medical source." It is appropriate for the ALJ to consider Plaintiff's testimony and claims of disability in light of the medical evidence and when faced with evidence that both supports and detracts from Plaintiff's claims, the Seventh Circuit recognizes that "the resolution of competing arguments based on the record is for the ALJ, not the court." *Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002).

Plaintiff also takes issue with the ALJ's observations that Plaintiff had not received or sought any treatment from a psychiatrist for her depression and anxiety. Even though lack of treatment or failure to seek treatment may not be a valid basis to reject a claim of disability due to depression, courts have held that a failure to seek medical attention may cast doubt upon the seriousness of an individual's alleged symptoms or ailments. *Caldarulo v. Bowen*, 857 F.2d 410, 413 (7th Cir. 1988). Specifically, the ALJ concluded that the type of medical care Plaintiff has received is not "the type of medical treatment one would expect for a totally disable individual. Her care has been routine and conservative." In addition, the ALJ noted that "the record does not

16

contain any opinions from treating or examining physicians indicating that [Plaintiff] is disabled or even has limitation greater than those determined in this decision."

It is appropriate to contrast the complaints made to doctors with the complaints alleged in a disability claim. *See Welsh v. Halter*, 170 F. Supp. 2d 807, 820 (N.D. Ill. 2001). In this case, the record provides adequate support for the ALJ's assessment of Plaintiff's testimony and credibility finding, and we are not persuaded by Plaintiff's arguments that the ALJ was wrong. *See Jens v. Barnhart*, __ F.3d __, 2003 WL 22319564, at *5 (7th Cir. Oct. 10, 2003). Indeed, it is clear that the ALJ considered and weighed Plaintiff's testimony in light of the objective medical evidence presented. ALJ Karmgard's analysis and credibility determinations are sufficiently articulated in his decision, and his conclusions are supported by substantial evidence.

## IV. The Vocational Expert's Testimony Supports the ALJ's Determination that Plaintiff Could Perform a Significant Number of Jobs

After listening to the testimony of Plaintiff and a vocational expert, ALJ Karmgard concluded that Plaintiff could not perform her past relevant work, but could perform a significant number of jobs existing in the national economy. Therefore, the ALJ determined that Plaintiff was not disabled and denied her application for disability benefits. Plaintiff argues that the ALJ did not properly consider the vocational expert's testimony and that, in fact, Plaintiff had additional limitations that prevented her from working. We disagree.

The ALJ presented specific hypothetical questions to the vocational expert with Plaintiff's particular limitations included as part of the hypothetical. In considering those questions, the vocational expert testified that an individual with those specified limitations would be able to work and that jobs existed for an individual of Plaintiffs' age, education, work

17

experience and residual functional capacity. Plaintiff argues that the ALJ should have presented all of the limitations to which Plaintiff testified and that the ALJ disregarded certain testimony presented by the vocational expert. However, an ALJ's hypothetical question to a vocational expert need only include those work-related limitations supported by the medical evidence and found to exist by the ALJ. *Steele*, 290 F.3d at 942; *Cass v. Shalala*, 8 F.3d 552, 556 (7th Cir. 1993) (vocational expert testimony supports the Commissioner's decision when a hypothetical question presented to the expert adequately reflects a claimant's work-related limitations).

As we explained above, the ALJ's residual functional capacity finding is supported by the evidence and when eliciting testimony from the vocational expert, the ALJ included all of the restrictions from the residual functional capacity finding. That is all that is required. The ALJ explained why he did not find credible certain of Plaintiff's alleged limitations, and those limitations, which were rejected by the ALJ, did not need to be presented to the vocational expert. Thus, the vocational expert's testimony was sufficient to carry the burden of demonstrating that other jobs existed for an individual with Plaintiff's limitations and restrictions.

## CONCLUSION

For the foregoing reasons, plaintiff Sienkiewicz's motion for summary judgment is denied, and defendant Commissioner Barnhart's motion for summary judgment is granted. This is a final and appealable order, terminating the case.

It is so ordered.

Wayne R. Andersen
United States District Judge

Dated: November 14, 2003